May it please the court, my name is Eduardo Roy and I represent the appellant in this matter, Mr. Sanjiv Kakkar. With the court's permission, I'd like to reserve five minutes of my time for rebuttal. In order for the government to be successful today, they're gonna have to show that they proved three things at trial. One, that my client made a false statement. Two, that he made a statement knowing that it was false. And three, that he did so with the intent of influencing a financial decision under 18 U.S.C. 1014. Now the government concedes in its opposition brief on page 11 that the only two issues that substantiated the 1014 conviction were a 2007 and a 2008 tax return purportedly signed or authorized by my client. Now at trial, the government attempted to get the evidence in under federal rules of evidence, 8012DA, admission of a part of the opponent. But they were unsuccessful in doing so. Can I ask a question that's really been puzzling me? Yes, Your Honor. Which is, my understanding was that the government introduced the two tax returns on the grounds that they were false, that they were false statements. So I didn't see why the hearsay rule would apply in the documents. Why is it hearsay? Could you lean into that microphone? Yes, Your Honor. Well, just explain to me why the hearsay rule is applicable in the documents? Why is it hearsay? Well, it's applicable because of the four issues that I'll be discussing. One of them is that the government should have examined the secondary hearsay on the documents. Why is it hearsay? I'm sorry. Could you lean into that microphone? Yes, Your Honor. Well, just explain to me why the hearsay rule would be applicable to the two tax returns which are being submitted as false? Well, when the government attempted, well, when the government submitted the tax returns, okay, there were two extra pieces of information on there that they were submitting. One was the facts and figures that were on the tax returns, and they were submitting those not for the truth of the matter asserted, but for the mere fact that they were false. So no hearsay exception was required there. However, the signature line, they were submitting that for the truth of the matter asserted, and that's where the court needed to make that secondary finding that the hearsay exception existed. So there was a signature on these documents, and that's an out-of-court statement that was submitted for the truth of the matter asserted, and it helped me understand how the signature, I mean, it was a question of whether it was fraudulent or not, or what are you actually saying there? I'm saying that the tax returns were not submitted by Mr. Kekar, and in order to show intent, the government had to show that the tax returns were signed by Mr. Kekar or they were authorized, the submission was authorized by Mr. Kekar. But they presented evidence to that effect. They had, they showed it probably wasn't the wife, and they talked to the bookie. I mean, there was various evidence that it was he who submitted it, but I still don't see why that has anything to do with the hearsay rule. Well, Your Honor, there was no direct evidence that Mr. Kekar submitted the tax returns to the bank. Right, but there was circumstantial evidence, which the jury, I guess, believed. Well, the court, the government tried to get the documents admitted under, for the hearsay rule, D-2A. Which is an exception to the hearsay rule, but it just, I guess I just have to remain puzzled as to why that was applicable. The signature attests to his statement that what was false was true. Well. Isn't that what they wanted to get in? Yes, but what I'm saying is that the court didn't allow the tax returns in because they couldn't show that Mr. Kekar had actually signed the documents. And so what the court then said is, this was a, when the government tried to get the documents in, I asked the voir dire, the custodian, and the voir dire lasted, or the back and forth lasted for around four hours before they were able to get three documents in. And after the custodian said, on the record, I have no idea how these records were kept. This is an incomplete file. The records are unreliable. You know, they had electronic records there. After all that was said on the record, the judge then looked and called a sidebar and looked to the government and said, it seems the only way you're going to get these documents in, because in the judge's mind, I'm sure he was saying the custodian just could lay absolutely no foundation, was that you're either going to have to do two things. You're either going to have to show that someone can authenticate the signature, or you're going to have to show that the records were turned in to the bank during the process, during the loan process. They weren't able to show that, because again, when I went back to voir dire the witness, I asked the witness, you know, was the document turned in during the loan process? Well, the government gave, the court gave the government the chance to try to get that in. They couldn't get it in. When I went back on voir dire, were you, did the tax returns, were they turned in with the loan process? She said no. I could point you to the record where she said no, these were not turned in. One of them couldn't have been turned in, right? One of them couldn't have been turned in. At the initial. The OA. Right. To obtain the loan. And the 2007 was specifically not turned in, because it was a bank document that said that the 2007 tax return was not considered. Putting aside the hearsay rule and the exceptions to the hearsay rule, which I'm just puzzled about, what elements are required, what would be required for the government to put a foundation to put these two documents into evidence? Putting aside the hearsay rule. Putting aside the hearsay rule, they would have two ways to get it in. To show that Mr. Kakar signed the tax returns or he authorized their submission. And if that were the case, they could have gotten them in under Federal Rules of Evidence 801. Or they could have followed. 801, that's the hearsay rule, right? 801. To show that it wasn't hearsay, because it was a statement. Right. But I'm saying. Okay. Put hearsay out of your mind for a moment, if you can. What would be required to say, I'm the bank. I have this loan file. In this loan file, I found these two tax returns. Why isn't that enough? Because to. And then you could argue about whether he had submitted it or somebody had submitted it to him on his behalf. But it certainly seems like there was evidence that they found this loan file. And in the loan file, they found these two documents. Well, yes, Your Honor. Because under 1014, they're going to have to show intent. And the way the government. Right. But that has nothing to do with getting the documents into evidence. That's their case. They have to show that as an element of their 1014 case. Well, yeah, they have to show how the documents got there. And what the government says. Setting aside how they got there, didn't the custodian testify they were being maintained as a bank record, even though she didn't know how they initially entered the system? Yes, Your Honor. She said that they were in the bank. They were in the loan file or they were in the bank file. They were in the bank file. And they were records regularly maintained by the bank. And it was in their business to maintain such records. Well, she couldn't testify to as to what the record-keeping practice was at or around the time those documents likely entered the file. Yeah, but she also said that the file was incomplete, and she said that the records were unreliable. Because when she turned over what was purportedly the 2007 tax return, and I questioned Your Honor, what she said was this was a partial 2007 tax return attached to a partial 2008 tax return attached to documents that were dated 2009. But that would put the weight of the government's case. And just I understood you were challenging they shouldn't have been admitted at all, but it seems like there was sufficient evidentiary foundation since they weren't being submitted for the truth. They were being submitted for the falsity. But, Your Honor, the signature line of who signed those documents was being submitted for the truth. It wasn't being submitted. If it was submitted for the falsity, that means it was Mr. Kakar that submitted it because it was his name on it. So the signature line on the tax returns were being submitted for the truth of the matter. But do you have another? So as an evidentiary matter, the question would be is a signature that's claimed to be false, is that hearsay? And I'm just not aware of a case that suggests that that's a proper subject for a hearsay ruling, and maybe you can point me to something. Well, Your Honor, you authored a case back in 2012, and the name escapes me right now. But you went through that exact process. It was a government form where what you penned was there are certain forms that are contained by a government file. Those were government files. This one here were bank records. All the bank can say is that I had these records in my file. They can't say who did them, and they don't need to, and they can't say who was it done. And then the government can put on other evidence to make its case, which is what they did here, if I understand it correctly. Yeah, but to continue to answer your question, what you say in your analysis on government forms was that there's only certain information that could be entered that's non-hearsay on these documents. And my assertion is that on these bank records that were not created by the bank, for the information that was found on the tax returns, they had to be able to show one that was either not hearsay, the facts and figures they were admitting not for the truth of the matter, but because they were false. But when it comes to the signature line, they were admitting that to say that this was signed by Mr. Kakar. And for that matter, they were going to have to find an exception. And that can't be lost on this Court. I mean, it just can't, because otherwise what the government is saying is we're submitting these tax returns not for the truth of the matter, but because it was on the form. And if it's not for the truth of the matter asserted, we're saying that it wasn't Mr. Kakar and they shouldn't have been allowed into evidence. Do you want to save some time for rebuttal? Yes, Your Honor, but I do want to at least address the other issues, and that's the wire fraud issues, counts two through seven. And I'll take at least a minute and save time for rebuttal. And so talking about 18 U.S.C. 1343, the government did not prove the case that they alleged. They alleged that Dixon Line was victimized. They now allege that the bank was defrauded. But they never alleged that the bank was defrauded in the indictment. The cases that we cite state very clearly that, you know, if the government wanted to allege. . . Didn't they prove they were both defrauded? Of course not, because the Dixon Line was never in possession of the money. The money was always Mr. Kakar's. So the indictment says the money was transferred from SBIC to Dixie Line to fund construction projects, and Kakar was required to submit vouchers to Dixie Line for reimbursement. And I guess their theory is that, as they go on, that he was submitting false vouchers to Dixie Line, which then would mean that the money that SBIC had given to Dixie Line. . . And would have been responsible to the bank. Excuse me, Your Honor. Dixie Line was not an obligation to the bank. The contract was between Mr. Kakar and Dixie Line. I thought the record said that Dixie Line was an escrow agent for the bank. For the bank. That is incorrect. Neither the government says that, nor does the record say that. The contract was between Dixie Line and Mr. Kakar. So SBIC gave money to Dixie Line without any contract or agreement between them? The bank never gave money to Dixie Line. From the record, I can show you that what the bank did is when the loan was financed, $900,000 immediately went to Mr. Kakar's accounts. The rest of the bank, the time when Mr. Kakar wanted money, what he would do is Dixie Line would tell the bank, the bank would send money from Mr. Kakar's account to Dixie Line, and Mr. Kakar would then send that to one of his other personal accounts. And that's direct testimony from the government witness. And the bank didn't have an agreement with Dixie Line for this? The bank had no agreement. . . I'm sorry, Your Honor, to speak over you. No problem. The bank had no agreement with Dixie Line. The agreement was specifically, the contract was specifically between Dixie Line and the bank, and the contract itself said that there were no third-party beneficiaries to the contract. Now I'd like to reserve the rest of my time for rebuttal. Okay. Good morning. My name is Philip Kopczynski, and I represent the United States. May it please the Court, I'll begin, if I may, with the question about the tax returns submitted to the bank. Judge Ikuda, I think you're right in that question about the truth of the matter asserted. That was something briefed, but never brought up at trial. I think my reading of the trial record is that the judge, Judge Davila, felt that 803-6 was the best route for the omission of these documents, and the discussion followed that track. But certainly the government had brought up in advance this party omission point. That would be the exception under 801. Why is it hearsay? Do you agree with opposing counsel that the signature on the tax return is a state, an out-of-court statement? I don't. I think that my colleague has been overly focused on this point about the signatures. Look, the fact is that signature matched signatures on lots of other documents where it's not disputed that Mr. Kakar signed. But we didn't have, like, signature experts at this trial. That really wasn't the issue. The issue is, did Mr. Kakar give that return to the bank? Now, the bank's custodian of records, Ms. Sutt, said yes. She said these come, quote, from the borrower, end quote. That's at ER-276. She says the same thing again later at ER-286. So the jury could disbelieve her. There was other evidence and testimony that she was unfamiliar with certain aspects of the bank's recordkeeping procedures. But I'm more focused on were the documents admitted and do we look at the correct lay and was the do we look at the hearsay rule in order to analyze it? And I was stumbling over looking at the hearsay rule because I didn't see what the hearsay was. It's a fair question. And as I say, it's something the government did address, to my recollection, in its briefs because of that very issue. This really isn't the truth. It's the falsity. The relevance of the documents is the fact that they got to the bank and you needed the custodial witness to put that in evidence, didn't you? Yes. But that fact alone I don't think is hearsay. The fact that the custodian could say we have a copy of this person's tax returns. It is in our file. It's in his law file. The point is the defendant's attack has been on the validity or the merit of the custodian's testimony with respect to the regularity of the record. So whether it's hearsay or something else, the fact is you have to get the record in evidence as a document that was communicated to the bank and it was relied upon by the bank. That was the fraudulent, the alleged fraudulent statement, correct? Yes. Although the last point, reliance, that's not an element of this crime. But otherwise, yes, Your Honor, I take your point, yes. And so just to follow up on that question, what normally, given that I'm assuming it seems to me this is not hearsay, what would you need at trial to set a foundation to bring this evidence in? Well, I think very little, frankly. If this is not hearsay under that view, I think, is it relevant? That's 401. Is it somehow prejudicial, 403? Of course, is it authentic? Those are all very low bars, as I'm sure Your Honor knows. And so if we were to set aside hearsay, I think it would be extraordinarily straightforward. Well, you have to link it to the defendant, so you have to have somebody, the custodian as judge. Yes. And here we had the custodian. We had the woman in charge of the entire Loans Records Department. But that also ties into the constructive amendment of the indictment issue, doesn't it? Because if secure really means obtained, then doesn't it become important when the alleged false representation is received by the bank? Yes. Well, first of all, secure does mean obtained. That's part of its meaning. Of course. But if it exclusively means obtained, then yes, I do think that implies something about the timing of the submission. But secure does not mean obtained. Those are different words. And the government drafts indictments carefully for this very reason. Secure has a broader meaning. So I'd like to address that more in a moment, but if I may quickly, just still on this admission question, the other thing I want to be sure to say is I do think Ms. Sutt, the custodian of records, laid an adequate foundation under 803-6. She said, quote, these come from the borrower. She addressed the dates on the returns. She addressed the fact that Mr. Kekar, like borrowers generally with the bank, has an obligation to present these within a fortnight, two weeks. So that addresses, A, the record is made at or near the time or transmitted by someone with knowledge. Then she talks about the regular practice of the bank. Quote, well, the question is, is it the regular practice of the bank to keep these records in the normal course of business, and these records include tax returns? Answer, yes, it is. There's B, the record was kept in the course of a regularly conducted activity. She repeats that again later. That's at ER-215. She also says they keep the records for the life of the loan. That's at ER-256. Subsection C of the rule is making the record a regular practice of that activity. Same points I just addressed. And there's also, again, she discusses in particular this defendant's obligation to submit his tax returns annually. That's at ER-272 to 273. So it's not just borrowers generally. It's this defendant. And they send an e-mail to remind him. And then they remind him if he doesn't do it. And, of course, this isn't some empty obligation of his. The penalty is a 2 percent interest increase and the possibility of default on the entire loan if he doesn't comply with these covenants, including submission of his financials. The final point of 803-6 is that these conditions are shown by the testimony of the custodian or another qualified witness. Well, here we have the custodian. She's been in banking since 1973. That's at ER-214 to 215. But not at this particular bank for that whole time. True. And I think that exact factor, Your Honor, is what the defense has tried to exploit. She wasn't a precipient witness to this commercial loan. She couldn't say with certainty exactly how this came in, who received it, the bank doesn't put a file stamp on it so they don't have an exact date of receipt. She couldn't say those things. We concede that. But this Court has said that doesn't matter. In United States v. Bland, for example, which is in my papers, and in other cases, those facts don't matter. And the final point, which the district court also carefully considered, is this sort of rebuttable piece of 803-6. This is subsection E. The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. And, of course, that's sort of speaking to the broader point of the hearsay rules, which is, are the records reliable? And Judge Davila thought carefully at that. That's at 306 of the record and 309 of the record. And he said, I don't see any reason to doubt the reliability of these records. And what was probably part of his thinking is that this is a very simple record-keeping activity. This isn't some sophisticated system. This is as simple as someone at the bank gets the tax return and sticks it in the file. That's it. That's the record-keeping practice at issue here. So that doesn't mean that it was Mr. Kakar who submitted it, however. The fact that it's in the file, of course, but there was a wealth of circumstantial evidence that it was him. And I could run through some of that briefly. I also, if I have time, want to quickly touch again on the constructive amendment point. But we know he's obligated to submit it each year. We know that there's no evidence he has a partner in this business or something. The topic of his wife is a little delicate because she was charged. And then we dismissed those charges when she signed a declaration and submitted to the government saying that Mr. Kakar was in charge of everything in their household. She said he forged her signature on these tax returns submitted to the bank. On the basis of that and her representations through her lawyer, she was dismissed from the case. Now, we didn't introduce that declaration to Mr. Kakar's case because it's not directly relevant. Calling her as a witness, of course, would have some marital privilege issues. We never went down that road. But any suggestion by Mr. Kakar that his wife is who submitted these returns to the bank is getting into a dicey area, given that record. And what we know, not all in the record, I grant, but below counsel represented some of that to the court as an officer of the court. And that's what we know about the wife. A few other points of circumstantial evidence. In terms of other people who conceivably could have submitted these returns, there was this notion of a bookkeeper for Mr. Kakar. That person turned out to be an Amway salesperson. So that didn't go anywhere, to say the least. Then finally, we had testimony from Dennis Young. That's Mr. Kakar's accountant of 20 years. Mr. Young looked at the form filed with the IRS. He compared it to his own records. He looked at the version given to the bank. And he says, for example, oh, there's my name and my stamp. It's his firm's name and his number, I believe. He has a license number. That's all on there. And he said, there's a copy stamp. He says, yeah, so my practice is I give one copy to the client to file with the IRS, and a second copy, and I put that copy stamp on it. So he believes that copy was the one doctored up and given to the bank. Importantly, Mr. Young also says, in 20 years, I've never interfaced with anyone other than Mr. Kakar. Not his wife, not, again, some partner in the business, no one else. And a final point I think is worth remembering is that we're talking about tax returns here. These are private documents. So it's not the case that the bank could get this from just anyone, or if somehow there's someone trying to frame Mr. Kakar that they could just get a copy of his tax returns and then doctor it up and make it look like it was Mr. Kakar. These are private documents. It's a very limited number of places that these documents could come from. And, in fact, we think the evidence overwhelmingly showed that they came from Mr. Kakar. So if I may, again, on the constructive amendment issue, as I said a moment ago, of course, reliance is not an element of this crime. And when it became clear that Mr. Kakar, during trial, was trying to exploit some of the uncertainty, frankly, in the record, about the exact day that his client submitted those 07 returns in relation to the approval of the loan, what the government argued in closing is, well, it doesn't matter, because he doctored up those returns, he put on false inflated numbers, and his purpose in doing so was to influence any action of the bank. That satisfies the statute for count one. That's the crime. And so that was the government's focus. And I think in large part was in response to Mr. Kakar's trial strategy, which was to try to focus very closely on exactly what that timeline is. I still think there's a very good case for saying that Mr. Kakar probably submitted that 07 return in early November 08. That's when it was due. It's dated October 13th. And then the loan is not approved with all the documents and the money dispersed until November 12th. So I think the evidence showed, to a reasonable degree of certainty, that it was probably in that early November period, before the loan is even dispersed. But it doesn't matter, because reliance by the bank on that return is not an element of the crime. And the indictment never pled otherwise. The indictment alleged secure. And that word is perfectly consistent. Mr. Kakar secures this loan, consistent with his obligations under the agreement, by providing his tax returns each year. So when I look at the indictment, the one section is titled in, like, facts, scheme and artifice to defraud. And paragraph 7 says, in order to secure the loan from SBIC, et cetera. But when I look at count 1, it incorporates those paragraphs. But then the actual charge just says he made false statements in connection with an application commitment and loan to refinance the Brookdale Inn. So how important is the paragraph 7, in order to secure the loan, compared to the actual language of the charge in count 1? Your Honor, I think that distinction shows why the allegation in the introductory section is of minimal relevance. And I think it would be why, at most, we have a harmless variance here, even if we accepted the defense's reading of the word secure. Count 1 is what counts. That's the operative language. And you're right that it's ‑‑ So it reincorporates those paragraphs, it says, in paragraph 14. But then paragraph 15 gives a charge and uses the language in connection with. Many false statements in connection with, as opposed to, in order to secure. Right. And so, at most, I would say that you read both of those together, and that in connection with language and in the mentioning of not just sort of the idea of applying for the loan, but the actual loan, the ongoing loan, that shows, again, that this is not a static event, and that you don't read secure as such. Secure is not a point in time in common usage. The idea of securing something is an ongoing point. And that's exactly, I think, a consistent ‑‑ a way to make that paragraph, which, as you say, is incorporated in Count 1, consistent with the language in paragraph 15. I just have ‑‑ over your time, but I just have one clarification point on an issue that nobody has touched on, is just in reading the record and preparing for today and looking at the issues that were raised. One, he raised a couple of issues regarding the calculation of loss and restitution. And just, I want to just clarify, there was a letter by Mr. Karkar to the bank regarding ‑‑ it looked like there was about $600,000 that was left. What happened to that $600,000? Was it accounted for? I believe it is. So, Your Honor ‑‑ It's not clear to me when you look at ‑‑ the bank said release a certain amount of money and subject to certain conditions and whatnot. That's right. And that's, I think, the point Mr. Karkar made in reply, is that that document doesn't on its face appear to show that it was released, just that it maybe was planned to be released or, as you say, subject to conditions. Right. Here's how I would read that. I would first note that the custodian who's submitting that document says that that document accounts for the remaining money. And this is years later. Right. So, despite the document on its face maybe not affirmatively showing the actual disposal. It's an affidavit of loss. What's that? It's an affidavit of loss. That's right. That's the context for it, of this being all submitted. And she says that accounts for the remaining funds. So, we can take her at her word. The other point I think that's really key here is. Well, the district court was entitled to take her at her word, wasn't it? I think so, because this is a preponderance of the evidence standard. That's 3663e. And there's no contrary evidence that it wasn't dispersed. But, again, I think a broader point here is that this is kind of a sideshow. The idea or the suggestion of the defense is that somehow this money held by the bank for these fire insurance offsets his restitution obligation. But you have this bank, through their custodian, saying in a declaration submitted under perjury that these funds are in a, quote, blocked account, end quote, for Mr. Kakar. To that end, the custodian says at no time did SBIC utilize the insurance proceeds without Sanjiv Kakar's consent and direction, end quote. So, here you have, under penalty of perjury, the bank saying that this is Mr. Kakar's money. This is not our money, even if we're holding it in account for him and then dispersing it. And they go through how they dispersed it, and so much money went here and so much there. Even if the court thought that that final document doesn't quite add up or it doesn't quite show the last some number of dollars being dispersed, I don't think it matters in light of that larger point that this is a blocked account. This is not the bank's money. And so there would be no basis for the district court to offset the bank's loss on this basis. All right. Okay. Thank you very much. We ask the court to affirm. Okay. Your Honor, there are a few things I want to address, but I need to go back to the 803-6 because it's rare that you get a bank custodian to say that she has no idea how the files are kept, that the files are incomplete, that the files are untrustworthy. If that doesn't keep bank records out, what will? That all goes to wait, doesn't it? Because that's what the district court judge said. That is exactly what the district court said, but he did so because of the perfunctory think that everyone believes that bank records are solemn and that, you know, they are protected in the highest way. But rarely do you have a bank custodian come up on the stand and say, our records are unreliable. It is a circumstance that many times, you know, there's personnel changes. You're not going to have the same custodian of the records from day one until . . . Absolutely, Your Honor. And that's why the . . . You were free to cross-examine her and show all, bring out all these shortcomings. You're right. You did. You're right, Your Honor. And that's why it's not a requirement that the custodian see, you know, who filled them out and any of that. But when the custodian says that the files or what she's submitting is unreliable because she had a partial 2007 tax return, a partial 2008 tax return, and documents from 2009 altogether, and presenting those as a document, and the bank's own custodian says that they're unreliable, the court should have said, you're right, they're unreliable. Because I can't see . . . If that doesn't persuade this court that those files should not have come in, there is no factual scenario. What do you say they were unreliable for? For . . . Are they unreliable to show that, in fact, that they were in the bank's file? What is it they're unreliable to establish? Your Honor, they're unreliable, it reminds me of the Wizard of Oz song, you know, because, because, because, because. They're unreliable because the files are incomplete. They're unreliable because they're jumbled together. They're unreliable because it's our assertion that there were e-mails that should have been in the file that showed that, that there were, that the 2007 tax returns weren't there. They're unreliable because we think that there was someone within the bank who may have changed the records. They're unreliable for a host of reasons, and because the custodian herself said that the file is incomplete, we know that there were documents there that should have been there that weren't there, that, you know, would have helped my client. They're unreliable because there were, there was information that we were looking for. But does it make the documents that are there unreliable for the purpose of that they are, that they are in the file? Yes, it does, Your Honor, because it was our contention that he did not, he did not submit that 2000 tax return that was there. And when the bank custodian says that the bank file is incomplete, you know, it's our assertion that, you know, if it had been a complete file, you know, we would have had information that would have helped my client. Now, you said you had two points you wanted to make. You've already wasted, not wasted, but you've gone over an extra two minutes. So if you have a, I'll give you one more minute to make one final point. Yes, Your Honor. Your Honor, on the 2000, on the counts two through seven, in the record on page 93, and if the law clerks look at not the bottom part, but the page 93 of cross-examination of Mr. or Director Mr. Basu, Mr. Basu says for each count that money came from Mr. Kakar's bank account and it went to Dixieline and then it went to Mr. Kakar's other accounts. The money was always his. There was no third party right to the bank, right? The money was always his. Dixieline did not own that money. Now, what the government did when the government says that they painfully, you know, draft these indictments carefully, what they really meant to do was say that the bank, you know, had been defrauded, right? But they didn't draft it that way. They drafted it and said Dixieline was defrauded. And that is just wrong. If you look at the Lew case, it's just absolutely wrong that two through seven cannot withhold scrutiny under that scenario. And then especially when the money is coming straight from Mr. Kakar's account. It's not coming from the bank. It's coming straight from his account to Dixieline and then to himself because the agreement was between Dixieline and Mr. Kakar. And the reasons he did it that way are only his reasons and are really unimportant other than that. Okay. Thank you so much. Exhausted your time. Thank you very much. We appreciate your arguments on this case and the matter is submitted at this time. And that ends our session for today. Thank you.
judges: Paez, Ikuta, Vitaliano